UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| OFFSHORE-INLAND SERVICES OF ALABAMA, INC., <br><br> Plaintiff, <br><br> v. <br><br> R/V DEEPOCEAN QUEST (ex NADIR), IMO No. 7347823, *in rem*, OCEAN SERVICES, LLC, *in personam,* and CASEMO INTERNATIONAL, S.A., <br><br> Defendants. | Case No.: C06-0183-JCC <br>    *Consolidated with C06-1114-JCC* <br><br> **IN ADMIRALTY** <br><br> **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| DEEP OCEAN QUEST, S.A., a foreign corporation, <br><br> Plaintiff, <br><br> v. <br><br> STABBERT MARITIME YACHT & SHIP LLC, a Washington limited liability company d/b/a Stabbert Maritime Yacht & Ship, Inc.; et al. <br><br> Defendants. | |

Plaintiff Deep Ocean Quest, S.A. ("DOQ") brought this action against Defendants

Stabbert Maritime Yacht & Ship, Inc. ("SM, Inc."), Stabbert Maritime Yacht & Ship, LLC,

("SM, LLC"), Ocean Services, LLC ("Ocean Services"), and Dan Stabbert and his marital community, for breach of a maritime contract to repair and refurbish a ship and for maritime torts. (Pretrial Order 1–2 (Dkt. No. 289).) DOQ asserted that SM, Inc., and SM, LLC, breached the parties' Vessel Management Agreement ("VMA") and warranty. (*Id.* at 2.) In addition, DOQ contended that Ocean Services breached an implied warranty and was liable in negligence. (*Id.*) Further, DOQ sought recovery against Dan Stabbert and his marital community, Ocean Services, and SM, LLC, under the alter ego doctrine and for disregarding corporate formalities. (*Id.*) Defendants pursued counterclaims against DOQ to recover amounts owed to SM, Inc./SM, LLC, under the Vessel Refurbishment/Repair Agreement ("VRRA"); for amounts owed for the administration of a Hurricane Katrina insurance claim; for quantum meruit; for indemnity for defending a claim brought by subcontractor Offshore-Inland Services of Alabama, Inc.; and for costs, prejudgment interest, and attorneys' fees. (*Id.* at 6; Defs.' Tr. Br. 53–61 (Dkt. No. 258).)

After a bench trial conducted from February 18 through March 10, 2009, the Court instructed the parties to submit written closing arguments. The Court advised that thereafter, the Court would prepare a short order announcing its decision and directing the prevailing party to submit proposed findings of fact and conclusions of law. On April 21, 2009, the Court issued a ten-page Order announcing its decision as to each of the claims and counterclaims. (Dkt. No. 333.) In that Order, the Court directed the substantially prevailing party, the Stabbert Defendants, to submit proposed findings of fact and conclusions of law consistent with the Court's rulings therein. Defendants submitted their proposed findings of fact and conclusions of law on May 20, 2009. (Dkt. No. 351.) The Court has carefully considered the proposed findings of fact and conclusions of law, the evidence submitted at trial, and the balance of pertinent materials in the record, and hereby enters the following Federal Rule of Civil Procedure 52(a) findings of fact and conclusions of law, which are based on Defendant's proposed version and contain some modifications.

# FINDINGS OF FACT

1.  There are two consolidated actions. Plaintiff Offshore-Inland Services of Alabama, Inc., initiated Cause No. C06-0183-JCC by filing a complaint on February 6, 2006, *in rem* against the Research Vessel DEEP OCEAN QUEST (ex NADIR) and against Ocean Services, LLC, *in personam*. That case was consolidated with Cause No. C06-1114-JCC and later settled. An order of dismissal confirming the settlement was entered on January 5, 2009. (Dkt. 248.)

2.  In the remaining action, Cause No. C06-1114-JCC, suit was commenced on August 8, 2006, by Plaintiff Deep Ocean Quest, SA ("DOQ"), a Panamanian company that owned the vessel DEEP OCEAN QUEST (now renamed ALUCIA) (the "Vessel") against Stabbert Maritime Yacht & Ship, LLC; SMY&S, Inc. ("SM, Inc.") (f/k/a Stabbert Maritime Yacht & Ship, Inc.); Ocean Services, LLC; Stabbert Maritime Holdings, LLC; Stabbert Maritime, LLC; Stabbert Yacht and Ship LLC; and Stabbert Yacht & Ship Holdings, LLC; all State of Washington companies. DOQ also joined as defendants the owners of the defendant companies, Dan Stabbert and his marital community. Causes C06-0183-JCC and C06-1114-JCC were consolidated on December 22, 2006. (Dkt. 33.)

3.  Plaintiff DOQ is a citizen of a foreign state and does not have its principal place of business within the State of Washington. Defendants are corporations, individuals and limited liability companies of the State of Washington with their principal place of business in the State of Washington. The amount in controversy exceeds the sum specified by 28 U.S.C. § 1332. The action commenced by DOQ is based on a maritime contract relating to repair and refurbishment of a ship, and allegations of maritime torts, which constitute admiralty and maritime claims within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.

4.     SM, Inc., (d/b/a Venture Pacific Marine, Inc.) and its affiliated company, Ocean Services, LLC, were experienced and successful in managing the refit and subsequent operation of a number of vessels prior to 2004. SM, Inc., specialized in yacht and research vessels, while Ocean Services specialized in commercial vessels. Their principal, Dan Stabbert ("Stabbert"), has considerable experience in this work and had developed a methodology by which vessels would be refitted with the vessel owner acting essentially as a general contractor and hiring skilled contractors and trades to perform the work.

5.     SM, Inc., previously managed the conversion of a tug into a yacht named ASTERIA for a wealthy Swiss industrialist named Stephan Schmidheiny and managed the operation of that yacht for Schmidheiny for several years.

6.     In mid-2004, Stabbert received a call from Schmidheiny, who indicated that he was interested in investing in the vessel NADIR with Mike McDowell. McDowell is an Australian national who had been engaged in selling dive trips to the TITANIC and space adventures. The NADIR was a 30-year-old, 183-foot former French research vessel which had been laid up and decommissioned. McDowell had purchased the NADIR for approximately $300,000 on or about August 9, 2004.

7.     Schmidheiny and McDowell told Stabbert they were interested in Stabbert's assistance in managing a refit of the NADIR in the United States.  Stabbert traveled to Toulon, France, to inspect the vessel and the parties further discussed the scope of the anticipated project. Stabbert was asked to prepare an estimate of the cost of the refit and for advice as to how the project could be managed.

8.     McDowell and Schmidheiny each acquired a 50% interest in the Panamanian corporation Casemo Internacional, SA, through which McDowell had acquired ownership of the

Vessel. The company was later renamed Deep Ocean Explorations, SA, and then Deep Ocean Quest, SA ("DOQ"). McDowell's interest in DOQ was acquired through his Utah limited liability company Deep Ocean Expeditions, LLC; Schmidheiny's interest was acquired through his Fairmont Company, SA. Schmidheiny funded most of the project through his Crea Trust, which was managed by Christian Verling. DOQ elected Christian Verling, Silvia Gallo (an accountant), McDowell, Manuel Quintero (a Panamanian lawyer), Belinda Sawyer and Peter McDowell as its directors.

9.      Stabbert introduced Boris Kirilloff as a naval architect and Joe Artese as an interior designer to DOQ and asked Kirilloff to fly to France to inspect the vessel. Kirilloff was subsequently retained as project naval architect and Artese for the anticipated interior work.

10.      SM, Inc., hired Rick Board as Captain on behalf of the vessel owners and the vessel departed France for the United States, where it was anticipated a refit would be accomplished. The parties contemplated the project would be accomplished in either Gulfport, Mississippi, or Seattle, Washington.

11.      Stabbert initially recommended against the refit of the Vessel on grounds that it might be more costly than the ultimate benefit. Stabbert also recommended that if the Vessel be refurbished, the refurbishment be done in Seattle rather than Gulfport. Stabbert also recommended against appointing DOQ nominee Patrick Lahey as the vessel owner's representative on grounds that he did not have the technical experience for such a role. DOQ rejected all of these recommendations and directed the vessel to Gulfport.

12.      During December 2004 and January 2005, DOQ and SM, Inc., negotiated a contract for the refit and management of the Vessel. Both parties were sophisticated and both had advice of counsel in the negotiations.

13.    On January 2, 2005, prior to a contract being signed, Stabbert explained that because the refit project would involve thousands of items, he anticipated an owner's representative being available in Gulfport full-time to oversee and approve purchases.

14.    The Vessel arrived at Gulfport on or about December 30, 2004, and was moored at a leased quay. On January 7, 2005, SM, Inc., assisted DOQ in setting up a Mississippi company, DeepOcean, LLC, ("DOLLC") to comply with local workmen's compensation laws for personnel. SM, Inc., was appointed as manager, with DOQ as sole owner and member. DOQ had complete control of DOLLC. An office was set up on site in Gulfport for DOLLC administrative support, including Captain Board, who was appointed as DOLLC's project manager.

15.    DOQ established an initial budget for the refit at $3.8 million and McDowell directed that the project be completed in five months.

16.    DOQ and SM, Inc., entered into two contracts: a Vessel Management Agreement ("VMA") (Dkt. No. 258-2 at 2) and a Vessel Refurbishment/Repair Agreement ("VRRA") (Dkt. No. 258-3 at 2). The contracts were integrated into a single agreement (the Contract).

17.    The VMA and the VRRA were signed twice, the first time on or about January 25, 2005, then again after February 25, 2005. The contract was made effective November 1, 2004. Prior to signing, the contract had been reviewed by counsel for both parties.

A. **The VMA Role Assigned to SM, Inc.**

The VMA somewhat paralleled the previous management contract for the yacht ASTERIA. The VMA is an agreement for delivering the Vessel from France to the United States, employing a crew, and managing, navigating and operating the vessel after refurbishment was complete. Paragraph 4 provides in pertinent part:

Manager shall at all times exercise the standard of care of a reasonably prudent vessel manager under similar circumstances, except that Manager may accept, act upon and/or implement approved instruction and/or direction from Owner without assuming further responsibility.

(VMA ¶ 4 (Dkt. No. 258-2 at 3).)

The VMA goes on to clearly spell out the duties of each party:

5. DUTIES OF MANAGER

Manager is granted authority to provide the following <u>vessel management services</u> on behalf of and as agent for Owner, excepting such matters as have been specifically allocated to Owner herein:

 A. procuring and maintaining insurances . . . .

 B. mobilizing the Vessel from its current location in France to the refurbishment port/place selected by Owner . . . .

 C. assisting, as directed by Owner, with the refurbishment, maintenance and repair of the Vessel in conformity with good ship management practices . . . .

 D. **employing officers, crew and other personnel for the Vessel, in Owner's name, on its behalf and as its authorized agent, with Manager authorized to employ, direct, supervise, train, discipline, terminate such personnel**, including negotiation and execution of articles and employment contracts. . . .

 E. outfitting and provisioning the vessel. . .

 F. managing, navigating and operating the Vessel at such times and in such places inside and outside of the United States as Owner from time to time directs. . .

 G. establishing accounting systems and practices, and maintaining books and records for the Vessel, consistent with those generally accepted in the industry. . .

 H. paying, when and as due, all fees, expenses and charges relating to the Vessel . . . .

 I. assisting as directed by Owner with the leasing and/or chartering the Vessel . . . .

> J.  performing other matters in Owner's name, on its behalf and as its authorized agent, reasonably necessary to accomplish the foregoing items; and
>
> K.  upon request from Owner, assisting Owner with respect to any one or more of the duties allocated to Owner in section 7, below, and/or elsewhere in this agreement.

(VMA ¶ 5 (Dkt. No. 258-2 at 3–4) (emphasis added).)

**B. The VMA Role Assigned to DOQ**

Under the VMA, DOQ had the following duties:

> 7.  DUTIES OF OWNER
>
> Owner shall be responsible for the following items during the full term of this agreement:
>
> A.  funding the Vessel Account, as identified in Section 9, below, and otherwise sufficiently to pay for all Vessel costs and expenses . . . .
>
> B.  tendering the Vessel to Manager . . . .
>
> C.  employing officers, crew and other personnel for the Vessel . . . .
>
> D.  developing and granting final approval of all plans, designs and specifications, and timelines and budgets, for any refurbishment and/or repair work to the Vessel . . . .
>
> E.  responding to Manager's inquiries and requests within a reasonable amount of time . . . , and
>
> F.  all other matters relating to the Vessel and not allocated to Manager in this agreement.

(VMA ¶ 7 (Dkt. No. 258-2 at 4).)

**C. Compensation**

The Manager was to be compensated in three phases of the project:  (1) for refurbishment and repair according to the VRRA, which was designated as Exhibit 1 to the VMA; (2) for mobilization from France to the designated refurbishment location at 12% of actual cost; and (3)

**FINDINGS OF FACT AND CONCLUSIONS OF LAW** - 8
No. 2:06-cv-00183-JCC

for management of operation of the vessel at the completion of the refurbishment, at an annual fee of $140,000. (*See* VMA ¶ 8 (Dkt. No. 258-2 at 5).)

A Vessel Account was to be opened at the Viking Bank in Seattle for use by SM, Inc., to pay third parties, with Owner to fund at opening a minimum of two months' operation, and to maintain a minimum of one month's operating expenses. (*Id.* ¶ 9.)

## D. **Refurbishment and Repair**

Section 21 of the VMA provides in pertinent part:

> **Owner shall be solely responsible for the preparation and final approval of all plans, designs and specifications, and timelines and budgets, for any refurbishment and/or repair work it wishes to have accomplished as to the Vessel, and for the engagement of all contractors and vendors necessary to complete such work**. In that regard, Owner has requested, and Manager has agreed, that Manager shall perform certain refurbishment and/or repair work, including assisting with the repair and preparation of the Vessel for its mobilization from France, refurbishment of the Vessel for its operation as a research vessel, and repair work arising while the Vessel is being managed by Manager during the term of this agreement.
>
> **All refurbishment and repair work to be accomplished by Manager shall be performed pursuant to the terms and conditions set forth on Exhibit 1 hereto, entitled Vessel Refurbishment/Repair Agreement**, and the Schedules attached thereto, both of which are incorporated into this agreement by reference. **Owner shall be solely responsible for the preparation and final approval of all plans, designs and specifications, and timelines and budgets**, for the specific refurbishment and/or repair work it wishes to have accomplished by Manager, which plans, designs and specifications, and timelines and budgets, shall be attached by Owner as "Schedules" to a Vessel Refurbishment/Repair Agreement upon the form attached as Exhibit 1 hereto. **Manager may review and/or comment upon the Schedules provided by Owner, but no such review or comment shall increase Manager's responsibilities or liabilities.** Once Owner has finalized and approved the Schedules setting forth the plans, designs and specifications, and timelines and budgets, for the specific refurbishment and/or repair work to be accomplished by Manager, Owner shall sign a Vessel Refurbishment/Repair Agreement upon the

format attached as Exhibit 1 hereto as well as the Schedules thereto, and present both to Manager for its review and countersignature.

(VMA ¶ 21 (Dkt. No. 258-2 at 9) (emphasis added).)

### E. Choice of Law – Attorneys' Fees

Section 20 states that the VMA is governed by the general maritime law of the United States, or by the laws of the State of Washington in the event there is no applicable general maritime rule of law. In the event of any litigation, the substantially prevailing party is entitled to recover its attorneys' fees and costs. (*Id*. ¶ 20.)

### F. Integration – The VRRA

Section 23 of the VMA incorporates the VRRA as an exhibit to the VMA. However, the VRRA narrows and more precisely defines the duties and liabilities of SM, Inc., relative to any repair or refurbishment of the vessel. Instead of the broad management role undertaken by SM, Inc., to operate the vessel under the VMA, SM, Inc., is given the responsibility to assist DOQ with project coordination, including DOQ's development of design specifications, timelines and budgets, selection of contractors, hiring them in Owner's name, and doing work as directed by DOQ. SM, Inc., was to pay contractors, vendors, and itself from the Vessel Account, and was to maintain books, consistent with those generally accepted in the industry. A Project Management Committee was to be established, with DOQ and its appointees to the Committee to be solely responsible for the design, timeline and budgets and for the selection, direction and control of vendors and contractors. DOQ was also given the responsibility to inspect the work, exercise quality control and coordinate with vendors to correct any deficiencies.

In the contract section dealing with defects in workmanship, DOQ agreed that SM, Inc., would have no liability for work performed or materials provided by contractors and vendors,

and that SM, Inc.'s liability for its own defective work be limited to $50,000 in the aggregate.

The intent of the contract is clear: the owner was to assume the responsibility for the plans, budgets and schedules, for selection and control of the contractors and for inspection of the work. The parties intended that DOQ act as its own general contractor and that SM, Inc., act as a manager to assist in the refit project.

The VRRA contains several important features that define the rights and liabilities of the parties:

- ◆ The "Basic Agreement" clause specifically states that DOQ is responsible for all plans, designs and specifications, and that DOQ "shall be <u>solely</u> responsible" for the parameters of the refurbishment/repair. (VRRA ¶ 1 (Dkt. No. 258-3 at 2) (emphasis added).)

- ◆ The same clause states that DOQ "shall be <u>solely</u> responsible for identifying overall parameters of the refurbishment/repair project, for developing and approving all plans, designs, specifications, timelines and budgets, and for approving and engaging all contractors and vendors as necessary to accomplish the project." (*Id.* (emphasis added).)

- ◆ The full-time employees of the Manager were to be billed to DOQ at the rate listed on Exhibit A to the Agreement. All other SM, Inc., employees, and all contractors/vendors hired by SM, Inc., on owner's behalf were to be marked up at 12%. (*Id.* ¶ 3.)

- ◆ The "Owners Responsibilities" section repeats and emphasizes DOQ's duties under the VRRA, including:

    A. establishing overall goal(s) and objective(s) for the project;

    C. engaging all contractors and vendors in its name, including Manager;

    D. developing and granting final approval of all plans, designs and specifications, and timelines and budgets, for all work it wishes to have performed, whether by Manager and/or other contractors and vendors;

    G. participating in the Project Management Committee and appointing a Representative with authority to accept work, execute change orders and otherwise act on Owner's behalf . . . ;

    H. carefully inspecting the vessel during and upon completion of the project

**FINDINGS OF FACT AND CONCLUSIONS OF LAW - 11**
No. 2:06-cv-00183-JCC

and noting deficiencies in performance . . . . (*Id.* ¶ 4.)

◆ In similar fashion, the "Manager Responsibilities" section clearly defines SM, Inc.'s duties, including:

B. assisting Owner with overall project coordination, including with respect to the development of plans, designs and specifications, and timelines and budgets, and the selection of other contractors and vendors, as requested by Owner and always subject to Owner's final review and approval;

C. providing Owner with access to employees, contractors and vendors with whom Manager has existing relationships . . . ;

D. engaging, in Owner's name, on its behalf and as its authorized agent, other contractors and vendors as directed by Owner or the Project Management Committee;

E. performing the specific work Owner wishes Manager itself to accomplish as identified on the Schedules attached hereto; and

F. paying all contractors and vendors, including itself, in Owner's name, on Owner's behalf and as Owner's authorized agent, from the Vessel Account established pursuant to the Management Agreement. (*Id.* ¶ 5.)

◆ The section outlining the Project Management Committee to be created provides that "*Owner*, including its appointee(s) to the [Committee] and Representative, *shall be <u>solely</u> responsible for the development and final approval of plans, designs, specifications, timelines and budgets*, and all changes thereto, *which arise during the course of work, as well as for the selection, direction and control of all vendors and contractors*, including Manager[.]" (*Id.* ¶ 6 (emphasis added).)

◆ The VRRA contains an exclusive warranty, covering only the repair/ refurbishment work directly performed by SM, Inc. This warranty also limits SM, Inc.'s liability to "repair/replacement of the defective workmanship and/or materials and to $50,000 in the aggregate or an amount equal to Manager's twelve percent (12%) compensation with respect thereto, whichever is less."  (*Id.* ¶ 10.)

◆ The VRRA also provides that "[i]n no event shall Manager be responsible for any incidental, special or consequential damages whatsoever, even if the possibility of such may have been or was foreseeable." (*Id.* ¶ 11.)

18.    DOQ clearly understood through McDowell that it was doing business with SM,

Inc., and not with Stabbert Maritime Holdings, LLC; Stabbert Maritime, LLC; Stabbert Yacht &

Ship, LLC; or Stabbert Yacht & Ship Holding, LLC. DOQ was aware that Ocean Services assisted in procuring documentation for the Atlantic Ocean transit. To the extent that Ocean Services assisted in the facilitation of work in Gulfport, was relied upon for credit by vendors, due to its reputation in the industry, or was delegated certain tasks, those actions benefited DOQ. There was no evidence of fraud on DOQ or any injustice or disregard of corporate formalities with respect to any of the affiliated Stabbert Defendants.

19.     Work on the Vessel refit commenced in Gulfport, Mississippi, in January 2005 and DOQ appointed Patrick Lahey as its Owner's Representative under the VRRA. The work performed in Gulfport was regarded as Phase I of the project. Lahey as Owner's Representative was on site only one-third of the time during Phase I.

20.     McDowell has contended that a Project Management Committee was never appointed. McDowell became the principal point of contact for DOQ and was significantly involved with planning and details of the project. McDowell generated hundreds of emails to SM, Inc., to Rick Board as project manager, and to Kirilloff, the project naval architect. DOQ did not intend to delegate its contractual responsibilities to SM, Inc. in any significant way.

21.     At the direction of DOQ, the scope of the project changed and increased substantially beginning in Phase I. These changes came from a number of representatives of DOQ, including McDowell, Carlos DePaco, Gallo, and Erica Knie, who was Schmidheiny's partner. These directions were sometimes conflicting and significantly impacted design, scheduling and management in an adverse way.

22.     The contract was modified in only one respect. SM, Inc., agreed to cap its 12% mark-up during the summer of 2005 when the project had already grown well beyond initial planning.  There was no other amendment of modification of the contract that in any way

lessened DOQ's responsibilities or increased those of SM, Inc. To the extent SM, Inc., attempted to assist DOQ in oversight, it did so without assuming further responsibility pursuant to VMA ¶ 4.

23. The contractual responsibilities of DOQ to provide inspection of work, design and scheduling were never waived by SM, Inc. Further, there was no waiver of the limitations of liability in the VRRA. At no time did SM, Inc., manifest an intent to relinquish a known right.

24. DOLLC engaged Offshore-Inland Services of Alabama, Inc., as a steel contractor to work on the vessel by issuing purchase orders in its name. Offshore-Inland had dealt with Ocean Services in the past and later contended erroneously that its agreement was with Ocean Services. Ocean Services was not engaged as a general contractor for any work on the vessel. Some of the steel work done by Offshore-Inland was deficient and Stabbert reasonably withheld $50,000 of Offshore-Inland's fees to cover this deficiency. Stabbert notified Offshore-Inland of these deficiencies and Offshore-Inland offered to provide credits. It is probable that Offshore-Inland would have fixed the deficient work had it been asked to do so and the failure of DOQ to have an on-site owner's representative on site likely contributed to this deficiency claim. In any event, neither SM, Inc., nor Ocean Services were negligent or breached any contracted duty in regard to work performed by Offshore-Inland.

25. The summer weather in 2005 at Gulfport was exceptionally severe, culminating in Hurricane Katrina on August 28. The hurricane had a devastating impact on the project and caused substantial damage to the vessel. SM, Inc., and DOQ entered into an agreement by the terms of which SM, Inc., would administer an insurance claim for hurricane damage in exchange for a 20% fee as a mark-up on such items as underwriters approved. SM, Inc., performed its services under this agreement and as of the date of trial, underwriters had approved and paid fees

for SM, Inc., in the amount of $483,518.40 into an escrow account held by FIS Marine, the insurance broker. DOQ blocked disbursement from this account in favor of SM, Inc., and the parties ultimately agreed that $1.2 million remain in the escrow account pending further order of the Court. (Dkt. 89.) DOQ has produced no credible evidence that shows why SM, Inc., should not be entitled to payment from the escrow, including any evidence to support DOQ's contention of unclean hands.

26.     After Hurricane Katrina, the vessel was towed to Seattle for completion of the work in what the parties regarded as Phase II of the project. DOQ recognized that it needed more thorough quality inspection and appointed Carlos DePaco in January 2006 to serve in that capacity. Shortly thereafter, DOQ recognized that DePaco was not technically qualified to perform as such and then appointed Boris Kirilloff for quality control. Kirilloff, who was still the project naval architect and somewhat overworked, in turn suggested that Aaron "Joe" Smith be so appointed. Smith did assume that role but was unable to be on site full-time. Finally, in April 4, 2006, Kirilloff recognized that the quality inspection was still lacking and suggested that Stabbert be asked to fill that role. However, Stabbert was never asked to do so. The quality inspection remained a responsibility of DOQ and DOQ's efforts in that regard were inadequate throughout the project.

27.     On January 1, 2006, SM, Inc., reorganized and formed Stabbert Maritime Yacht & Ship, LLC ("SM, LLC") for tax reasons and changed its name to SMY&S, Inc.  It delegated performance under the VMA and VRRA to SM, LLC, which continued to use the trade name Venture Pacific Marine.  SM, LLC, is the successor company to SM, Inc.

28.     The project expansion and conflicting directions from DOQ continued in Phase II. Many of the vessel's features and much of its equipment were significantly upgraded after the hurricane damage. By the end of May 2006, DOQ had spent $13,189,679 on the vessel.

29.     DOQ had fundamentally changed its goal from a limited refurbishment of a commercial-class dive support vessel to the transformation of the Vessel into a research vessel with well-appointed yacht-style accommodations that required design changes and the addition of modern and high-tech features throughout. Examples include a major change in crew quarters, dynamic positioning, removal of controllable pitch propellers, new main engines, new generator ends, new switchboard, addition of a new sophisticated Reson 8111 multi-beam sonar, doubling the air conditioning and an extensive audio visual system.

30.     SM, Inc., complained to DOQ about the lack of an on-site owner's representative and about the conflicting instructions it was receiving. Finally, Stabbert wrote to Schmidheiny and Knie on April 20, 2006, and pointed out the costly changes, lack of owner support, and increased level of specifications that had led to significant problems. Stabbert suggested that (1) the issues be solved; (2) SM, Inc., terminate as manager; or (3) the vessel be sold.

31.     DOQ accepted SM, Inc.'s suggestion to terminate the VMA and VRRA and the contract was terminated effective April 27, 2006.

32.     Following termination of the contract, DOQ attempted completion of the project in what it designated as Phase III. Joe Smith was appointed as project manager for Phase III. The cost of the project continued to escalate and by the time of trial McDowell contended DOQ had spent $28 million on the vessel and that it was worth $42 million.

33.     On August 8, 2006, DOQ filed this action claiming breach of contract, breach of express warranty, negligence, implied warranty and for an accounting. Ultimately, DOQ made

fifty-eight separate claims of alleged deficient work on the vessel, which it contended were caused by Defendants' breach of a legal duty. This Court dismissed certain claims in its order granting in part and denying in part Defendants' motion for summary judgment. (Dkt. 87.) Thereafter, this Court excluded certain claims presented by DOQ on grounds of late disclosure. (Dkt. 174.) DOQ dropped several claims prior to trial and ultimately thirty-nine claims for alleged deficient work remained for trial. No proof was adduced as to eight of these. (*See* Appendix A to Defendant's Closing Argument (Dkt. No. 332).)

34.    On December 20, 2006, Schmidheiny withdrew his Fairmont Company as a shareholder in DOQ and requested of McDowell that Fairmont representatives not be involved in the litigation.

35.    On March 7, 2007, DOQ transferred the vessel to its remaining shareholder Deep Ocean Expeditions, LLC ("DOE").

36.    On May 28, 2008, DOE filed a petition in bankruptcy in this District seeking reorganization.

## CONCLUSIONS OF LAW

1.    The Court incorporates by reference its decision dated April 21, 2009 (Dkt. No. 333), as part of these Findings of Fact and Conclusions of Law.

2.    This Court has jurisdiction pursuant to 28 U.S.C. §§ 1332, 1333 and 1367(a).

3.    The contract, the VMA and the VRRA, constitutes a maritime contract within the meaning of Rule 9(h).

4.    The VMA and VRRA are enforceable according to their terms. The contract placed the responsibility on DOQ to inspect the work, and to have sole responsibility for the preparation of design, specifications, timelines and budgets.

5.     The contract insulated SM, Inc., from any liability for deficient work performed by third parties. The contract also prohibited any claim for consequential damages.

6.     DOQ failed to prove SM, Inc., or its delegatee SM,LLC, breached any duty under the contract and failed to prove that SM, Inc., did not carry out its management responsibilities with reasonable care.

7.     DOQ failed to prove by a preponderance of the evidence that SM, Inc., or its delegatee SM, LLC, breached any duty of reasonable care as a Manager under the Contract or that any Defendant caused a deficiency.  The principal witness in support of DOQ's contentions of deficiencies was Aaron "Joe" Smith, whose testimony the Court finds was not entirely credible.

8.     The claimed deficiencies:

(1)  Resulted from unknown causes; or

(2)  Were incomplete work; or

(3)  Were upgrades to the mission of the vessel; or

(4)  Were solely the result of DOQ's own failure to carry out its contract responsibilities including inspection; or

(5)  Were not deficiencies at all; or

(6)  Were defective work of a third party not attributable to management.

In some instances, DOQ unreasonably declined to request a correction in work by a contractor or rejected an offer by the contractor to repair the defect. There was no evidence that SM, Inc. performed any defective work. (*See* Appendix B to Defendants' closing argument (Dkt. 327).)

9.     SM, Inc., supplied adequate accounting to DOQ during the project in full compliance with the VMA. DOQ introduced no evidence to the contrary.

10.     SM, Inc., failed to adduce adequate proof to show it is entitled to compensation for hurricane repair work beyond the 20% mark-up for items approved by insurance, or for remaining work under the VRRA.

11.     SM, Inc., reasonably incurred legal defense costs of $78,000 in defending against Offshore-Inland in a project-related lawsuit brought against its affiliate Ocean Services, which had been reasonably delegated a task to assist DOQ. This was a claim arising out of and relating to the vessel project and the Contract even though Offshore-Inland incorrectly named Ocean Services as a defendant.

12.     In only two instances does DOQ contend that SM, Inc., as agent, failed to contract in DOQ's name: the Offshore-Inland suit and the Excel contract for insulation work. The purchase orders, however, in both instances were issued in DOLLC's name. Moreover, DOQ can demonstrate no harm arising out of either instance.

13.     DOQ failed to present sufficient evidence to allow a reasonable fact finder to hold Dan Stabbert or his marital community liable to DOQ under the Contract or any other theory.

14.     The Court finds SM, Inc., to be the substantially prevailing party.

15.     There is no tort remedy in maritime law for purely economic loss stemming from negligent performance of contract for professional services where those services are related to the repair of a vessel. *See East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 871–72 (1986) (stating that "damage to the product itself is most naturally understood as a warranty claim"); *Employers Ins. of Wasau v. Suwannee River Spa Lines, Inc.*, 866 F.2d 752, 755 (5th Cr. 1989) (holding that "the economic loss rule adopted in the *East River* case precludes

recovery in maritime tort for purely economic loss stemming from the negligent performance of a contract for professional services where those services are rendered as part of the construction of a vessel"); *Nathaniel Shipping, Inc. v. Gen. Elec. Co., Inc.*, 932 F.2d 366, 368 n.3 (5th Cir. 1991) (declining to find a distinction between services for the manufacture of a new vessel and services related to the repair of an existing vessel). Washington law is in accord. *Alejandre v. Bull*, 153 P.3d 864, 867 (Wash. 2007) (explaining that the "economic loss rule applies to hold parties to their contract remedies when a loss potentially implicates both tort and contract relief").

16.     Neither SM, Inc., nor Ocean Services acted as general contractors with respect to the vessel refit; neither entity breached any legal duty, express or implied, owing to DOQ.

17.     SM, Inc., did not waive any contract responsibilities assigned to DOQ. SM, Inc., and DOQ never modified the duties assigned to the parties under the Contract.

18.     DOQ failed to establish that any Defendant entity used its alter ego to perpetuate a fraud or injustice or other exceptional circumstances to pierce the corporate veil. *See Chan v. Soc'y Expeditions, Inc.*, 123 F.3d 1287, 1294 (9th Cir. 1997). DOQ also failed to establish any basis for the personal liability of Dan or Cheryl Stabbert or their marital community.

19.     SM, Inc., performed its contract for administration of the insurance claim and DOQ failed to establish any legal right to block payment to SM, Inc., from the FIS broker's account.

20.     SM, Inc., is entitled to indemnity for its reasonable expenses in defending the *Offshore-Inland* lawsuit to the extent of $40,000.00 as permitted by the order of dismissal entered on December 23, 2008. (Dkt. 248.)

21.     Defendants are entitled to entry of a judgment dismissing all claims against them

with prejudice together with costs.

22.    SM, Inc., failed to establish a right to recover unpaid amounts of insurance proceeds beyond the 20% approved by underwriters or that it was entitled to recover unpaid billings for repair and refurbishment.

23.    SM, Inc., is entitled to an order that DOQ pay from the insurance fund the amount approved by underwriters for the 20% markup for SM, Inc., within 30 days of the finalization of the insurance claim together with any accrued interest earned on that amount.

24.    SM, Inc., is the substantially prevailing party under the contract and entitled to a judgment against DOQ for the reasonable legal fees incurred in this litigation. The Court's detailed decision on the fee petition is contained in a separate order issued today.

25.    The Orders of this Court dated October 2, 2007 (Dkt. 87), November 29, 2007 (Dkt. 125), March 17, 2008 (Dkt. 174), and April 21, 2009 (Dkt. 333) are incorporated by reference herein to the extent not modified by these conclusions of law.

DATED this 18th day of June, 2009.


John C. Coughenour
UNITED STATES DISTRICT JUDGE